**STATE of Missouri, Plaintiff-Respondent,**

v.

**Richard E. HARLEY, alias Stephen Allen Young, Defendant-Appellant.**

**No. 9681.**

Missouri Court of Appeals, Springfield District.

Sept. 23, 1976.

Motion for Rehearing or Transfer Denied Oct. 8, 1976.

Application to Transfer Denied Dec. 13, 1976.

William J. Fleischaker, Public Defender, 29th Judicial Circuit, Joplin, for defendant-appellant.

John C. Danforth, Atty. Gen., Robert H. House, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

Before STONE, P. J., and HOGAN and TITUS, JJ.

HOGAN, Judge.

Defendant Richard E. Harley, alias Stephen Allen Young, was found guilty of first-degree felony murder as defined and denounced by § 559.010, RSMo 1969, V.A. M.S.[1] His punishment was assessed at imprisonment for life and he appeals.

1. The statute read: "Every murder which shall be committed by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, and every homi-

The case involves the robbery of a supermarket and the killing of a hostage taken by the defendant. Fairly stated in accordance with the result reached, the evidence was: That Foodtown No. 5 is a supermarket located on Seventh Street between Jackson and Connor Streets in the City of Joplin, Missouri. Seventh Street runs east and west; Jackson and Connor Streets run north and south.

During the afternoon of July 9, 1973, defendant parked his car on Connor Street just west of Foodtown. He entered the store from the "back" (north) side, approached Mildred Stanley, an employee, and asked if she were in charge. Mrs. Stanley said she was not. Defendant asked to see the manager, and was directed to the stockroom at the rear of the store. The "head clerk", a Mr. Jenness, was called on the intercom.

Defendant met Jenness at the front of the store, and asked about employment. Jenness said he was not in charge of employment, whereupon defendant "showed [Jenness] the flash of a gun", told Jenness that "this was a holdup" and ordered Jenness to the stockroom. Defendant then ordered Jenness to have all the money brought to the stockroom. Upon Jenness' instruction, Mrs. Stanley gathered the money from the "office", most of the money from the cash registers and put it in a green bag marked "First National Bank". She took the money bag to the stockroom. Defendant told her "[d]on't look at me and throw the money on the floor." Mrs. Stanley did as she was told.

The defendant then advised Jenness, Mrs. Stanley and two stockroom employees that he was going to take a hostage. For reasons not immediately apparent, defendant asked the name of the youngest checker. Told that Barbara Conrey was the youngest checker, defendant had her paged on the intercom. Mrs. Conrey came to the stock-

room. Defendant then said, according to Mrs. Stanley, that he was not a "sex fiend" or "sex maniac" and would not harm Mrs. Conrey; that if the police were not called for 30 minutes (according to Jenness, for an hour), defendant would then release Mrs. Conrey, call the store and tell the employees where she had been released.

The Joplin City Police Department had been informed, by whatever means, that the robbery was in progress, and several police vehicles were dispatched to the scene. Upon trial, the defendant's movements after he left the Foodtown Market were retraced in laborious detail, which need not be set out here. After the defendant had traveled six to nine blocks north and west to the intersection of Fifth Street and Maiden Lane, he found his escape route blocked and his car, driven by Mrs. Conrey, was stopped on the north side of Fifth Street, a short distance east of the roadblock.

Defendant was apprehended during a sort of television cops-and-robbers imbroglio. Detective Fuhr, who had followed the defendant directly from Foodtown in an unmarked vehicle, testified that when he saw defendant's vehicle stopped on Fifth Street, he got out of his car, went to a nearby police vehicle equipped with a loudspeaker, and started moving toward the defendant's automobile. Mrs. Conrey was behind the steering wheel and defendant was seated to her right, "close enough to have body contact." As Fuhr drove forward, Mrs. Conrey "yelled" at him to stop or the defendant would kill her. Fuhr stopped his vehicle, stepped behind it, and addressed the defendant over the loudspeaker. He identified himself as a police officer; he began asking questions to determine precisely who was in the defendant's car. Mrs. Conrey identified herself— "spelled her last name". As he was asking, Fuhr saw the defendant holding what appeared to be a dark-colored revolver with

cide which shall be committed in the perpetration or attempt to perpetrate any arson, rape, *robbery*, burglary or mayhem, shall be deemed murder in the first degree." (Emphasis added.) This statute was repealed Laws of Mo.1975,

Act 2A, § A, but was in force when this case was tried in 1973. References to statutes and rules are to RSMo 1969, V.A.M.S. and V.A. M.R.

white handles "just right up against" Mrs. Conrey's head. Fuhr advised the defendant "there was no way out from where he was", but Mrs. Conrey, apparently relaying defendant's remarks, again stated that if the roadblock were not removed, defendant would kill her. Defendant emphasized his intention by firing three shots out the left window of his car.

The Joplin police officers discussed various alternatives, including a substitution of hostages. This alternative was vetoed by the Chief of Police, but the officers did tell the defendant that the roadblock would be removed if Mrs. Conrey were released. Defendant refused. Relaying his demands through Mrs. Conrey, the defendant told officers that if the roadblock were not removed in 90 seconds, he would kill Mrs. Conrey. Fuhr was not close enough to the defendant's car to hear clearly, but got the impression that the defendant then began a "countdown". Shortly thereafter, Fuhr heard a "small pop", like a small caliber muffled shot, and at the same instant, two "larger" explosions. Mrs. Conrey's head went forward and then back, and at the same time defendant fell to his right, throwing his hand up in the air. Fuhr and Detective Forney then went to the defendant's car, found that Mrs. Conrey had been shot in the head, and that the defendant appeared to be injured. Fuhr located the defendant's pistol, a .22 caliber revolver with white handles, lying in the street near the right side of the car.

The extraneous firing—the two "larger" explosions—which immediately preceded Mrs. Conrey's demise was apparently the result of two attempts by police officers to snipe the defendant. Detective Forney, who was near defendant's car when Mrs. Conrey was killed, testified that he saw Mrs. Conrey "slump to the left" and "at this time" a shot was fired "from [his] left" which started a "spinning motion" on the defendant's part; "almost simultaneously" there was another shot from the north (defendant's right) which shattered the glass on the "passenger's side" and thereafter defendant's pistol "flew out of [the defend-

ant's] hand and dropped down to the pavement." The shot from Forney's left appears to have been fired by Officer Gary Box, one of the several officers present; the shot from the north (Forney's right), which shattered the windshield, apparently was fired by Detective McAfee. Officer Box's shot went through the roof of the car and lodged in the side; Detective McAfee's shot, as noted, shattered the right window of defendant's car and inferably caused the defendant to drop his pistol. Neither of the two shots fired by the officers struck the defendant or Mrs. Conrey.

It was stipulated that after Mrs. Conrey was taken from the defendant's automobile, she was first taken to a Joplin hospital, then to a Springfield hospital, where she was pronounced dead. The State had the evidence of Dr. Victor Carnes, a pathologist who performed an autopsy on Mrs. Conrey's body on July 10, 1973. Dr. Carnes testified that his only abnormal finding was a head wound, in the back of the head, slightly to the left of the midline and about the level of the ear. The wound was a bullet wound; examination of the cranial contents showed that the bullet had immediately penetrated Mrs. Conrey's skull and had richocheted inside her skull so as to penetrate both the left and right hemispheres of the brain and had come to rest barely within the brain substance above Mrs. Conrey's right eye about halfway down her forehead. Dr. Carnes stated that the bullet wound was the cause of Mrs. Conrey's death and that in his opinion she was in normal health prior to being shot. It was shown beyond doubt that the bullet taken from Mrs. Conrey's skull had come from the defendant's pistol. Other facts, as relevant, will be noticed in the course of this opinion.

█ In this court the defendant has briefed and argued two assignments of error. Both assignments deal with alleged error in giving and refusing instructions. The State has answered these contentions as presented. Our inspection of the record discloses, however, that on the day the verdict was received, October 10, 1973, defendant was granted 30 days to file a motion for

new trial. No extension of this time appears in the record. The motion for new trial was not filed until November 13, 1973, 34 days after reception of the verdict and entry of the order granting 30 days in which to file the motion. Neither the State nor this court can waive the mandatory requirements of Rule 27.20(a).[2] We must hold that the motion for new trial is a nullity and preserves nothing for review. *State v. Howard*, 476 S.W.2d 587, 588 (Mo. 1972); *State v. White*, 439 S.W.2d 752, 753[1] (Mo.1969); *State v. Nelson*, 526 S.W.2d 56, 57[1] (Mo.App.1975). This court has, of course, the discretionary power to review the record for plain error affecting substantial rights pursuant to Rule 27.20(c). Because the defendant has received two life sentences for crimes committed in the same transaction, and because failure to instruct on all defenses supported by substantial evidence *may* constitute plain error, *State v. Randolph*, 496 S.W.2d 257, 261[4] (Mo. banc 1973), we shall, in this instance, review the record for plain error. Preliminarily we note 1) that in general, instructional error is not "plain error" unless the trial court has so misdirected or failed to instruct the jury on the law of the case as to cause manifest injustice, *State v. Bridges*, 491 S.W.2d 543, 547[4] (Mo.1973); *State v. Auger*, 434 S.W.2d 1, 4[1] (Mo.1968); *State v. Murphy*, 533 S.W.2d 716, 718[7] (Mo.App.1976), and 2) that when this case was tried in 1973 failure to instruct the jury on all the law of the case did not of itself constitute plain error. *State v. Randolph*, supra, 496 S.W.2d at 263 (concurring opinion); *State v. Patterson*, 443 S.W.2d 104, 106–107[2] (Mo. banc 1969). In the course of our review, we shall notice the points advanced by the defendant on appeal.

The defendant's first point, as briefed, is: "The trial court erred in giving Instruction No. 4, the verdict-directing instruction, for the reason that the instruction failed to conform to the information charging defendant with this crime." We are cited only to 23A C.J.S. Criminal Law § 1311 (1961), which states that in criminal cases the instructions should be confined to the issues raised by the pleadings, and should be neither broader nor narrower than the indictment or information. Defendant also asserts that the information charges first-degree murder "conjunctively" and that the trial court erred in failing to instruct the jury on first-degree murder in conventional form.

The information is not artfully drawn, but read as a whole, it charges that the defendant, in the County of Jasper, on a specified day, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, shot Barbara Conrey in the head with a .22 caliber pistol, thereby inflicting a mortal wound of which wound the said Barbara Conrey died. The information is sufficient to charge defendant with murder in the first degree. *State v. Kenyon*, 343 Mo. 1168, 1179, 126 S.W.2d 245, 251[6] (1938). The omission of the usual averment "on purpose" following the allegation of premeditation does not vitiate the information, *State v. Foran*, 255 Mo. 213, 222, 164 S.W. 215, 217[6] (1914), nor is it of any consequence that the place of Mrs. Conrey's death was not averred. *State v. Majors*, 329 Mo. 148, 154–155, 44 S.W.2d 163, 166[3] (1931). True, the information contains the conclusional averment that the killing was committed "in the perpetration of a robbery of James Robert Jenness and Mildred Stanley, agents and employees of Store # 5, Foodtown Inc., a corporation", but inasmuch as the information is otherwise sufficient, that conclusional averment may and should be disregarded as surplusage, *State v. Sykes*, 436 S.W.2d 32, 35[6, 7] (Mo.1969); *State v. Meyers*, 99 Mo. 107, 114, 12 S.W. 516, 517[2] (1889), and so, contrary to the defendant's assertion, the information charges nothing more than first-degree murder in conventional form.

---

**2.** Which provides, as here material: "Such motion [for new trial] shall be filed before judgment and within ten days after the return of the verdict: Provided, on application of defendant, the court may extend the time for filing such motion for an additional period of thirty (30) days".

■ Instruction No. 4 need not be set out at length. Even though this case was tried in 1973, Instruction No. 4 is almost a literal copy of MAI–CR 6.19. The State's proof amply showed that the killing took place during the perpetration of a robbery, and Instruction No. 4 correctly defined that offense, as suggested in *State v. Goacher*, 376 S.W.2d 97, 106–107[18] (Mo.1964). The State was, of course, entitled to plead murder in the first degree and prove and submit felony murder in the first degree. *State v. Jenkins*, 494 S.W.2d 14, 17[1] (Mo. 1973); *State v. Owens*, 486 S.W.2d 462, 467[7] (Mo.1972); *State v. Smith*, 310 S.W.2d 845, 848[1] (Mo.1958), cert. denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231 (1958). There was no error, much less plain error in the respects alleged, and defendant's point is without merit.

Defendant further contends that the trial court erred 1) in failing to instruct the jury on "conventional" first-degree murder, and 2) in failing to instruct the jury on lesser graded or necessarily included degrees of homicide, specifically second-degree murder and manslaughter, because, he says, such issues were raised by the pleadings and were supported by the evidence.

■ Defendant's argument that an instruction on "conventional" first-degree murder should have been given is based on the premise that the underlying felony was no longer in existence when Mrs. Conrey was killed. Defendant acknowledges that when a homicide was committed during the perpetration of one of the felonies enumerated in § 559.010, proof of the underlying felony stood in lieu of and was equivalent to proof of the deliberation, premeditation and malice required for conviction of first-degree murder. *State v. Ford*, 495 S.W.2d 408, 417[11] (Mo. banc 1973); *State v. Glenn*, 429 S.W.2d 225, 236[23] (Mo. banc 1968); *State v. Burnett*, 365 Mo. 1060, 1073, 293 S.W.2d 335, 343[13] (banc 1956), cert. denied, 352 U.S. 976, 77 S.Ct. 367, 1 L.Ed.2d 326 (1957).

The record evidence in this case was that the defendant left the supermarket with Mrs. Conrey. He went directly to his automobile, holding his hostage at gunpoint, carrying the money he had stolen. Police officers followed the defendant in an unmarked car as he attempted to escape. By our calculation defendant traveled no more than six to nine blocks before he encountered the roadblock at the intersection of Fifth Street and Maiden Lane. The killing occurred not more than five minutes after the robbery, and, without detailing the proof, the State's evidence showed beyond cavil that defendant was in possession of the very money he stole when he killed Mrs. Conrey.

It is true that flight is not an element of robbery and we suppose that before the killing the crime of robbery was complete in the sense that prosecution therefor could have been maintained, *State v. Brletic*, 283 S.W.2d 568, 572[3] (Mo.1955), but that fact does not mean the homicide was not committed in the perpetration of the robbery for the purposes of this felony murder prosecution. *State v. Messino*, 325 Mo. 743, 764–765, 30 S.W.2d 750, 759[13] (1930). Our courts have consistently held that a felony murder is within the res gestae of the underlying felony when the initial crime and the homicide are parts of one continuous transaction and are closely connected in point of time, place and causal connection, as when the killing is done in flight from the scene of the crime to prevent detection or promote escape. *State v. Glenn*, supra, 429 S.W.2d at 231[4]; *State v. Adams*, 339 Mo. 926, 933, 98 S.W.2d 632, 637[5], 108 A.L.R. 838, 844 (1936); *State v. Messino*, supra, 325 Mo. at 764–765, 30 S.W.2d at 759[13]. In light of these controlling precedents, defendant's argument that the underlying felony was no longer in existence when he killed Mrs. Conrey is patently without merit. There was, therefore, no reason in the circumstances of this case to give the jury an instruction authorizing a finding of deliberation from circumstances other than the commission of the robbery.

The final point for consideration is that the trial court should have instructed the jury on lesser graded or necessarily included offenses, specifically, murder in the

second degree and manslaughter. On this point we are cited to MAI–CR Comments, Lesser Graded or Included Offenses, without specification of any particular comment; to *State v. Anderson*, 515 S.W.2d 534 (Mo. banc 1974); and *State v. Mills*, 352 Mo. 774, 179 S.W.2d 95 (1944). In *State v. Anderson*, the court was primarily concerned with the "partial" or "diminished" responsibility doctrine, but in the course of its opinion noted two premises which, apparently, defendant wishes to utilize. The court held, 515 S.W.2d at 537[1], that a) the elements of first-degree murder were deliberation, premeditation and malice; b) the elements of second-degree murder were premeditation and malice, and c) that manslaughter was any other killing (not justifiable or excusable) which necessarily was without malice. The court went on to construe § 546.070, para. (4), and Rule 26.02, para. (6),[3] to mean that the trial court, in homicide cases, must instruct the jury on all degrees of homicide which the evidence supported unless the trial court could say, as a matter of law, that there was an entire absence of evidence to support a conviction of a particular offense. *State v. Anderson*, supra, 515 S.W.2d at 537[2, 3]. We are in no doubt that *Anderson* correctly stated the general law as it stood when this case was tried, *State v. Mudgett*, 531 S.W.2d 275, 280–281[5] (Mo. banc 1975), but the court's ruling in *Anderson* does not, as we read it, aid the defendant in the circumstances here present.

Specifically, defendant's argument that the jury should have been instructed on lesser graded degrees of homicide rests upon the premise that his denial of any *intent* to kill Mrs. Conrey warranted such instruction. In our opinion, the premise is faulty.

The defendant did not testify; the evidence to which our attention is called came before the jury as part of an in-custody statement made to the Joplin Police after the defendant was apprehended. The State offered part of the statement, or confession, and it was received without objection. The defendant's answers to questions propounded by the officers are rambling and unresponsive almost to the point of incoherence. The following questions and answers are fairly illustrative:

Q. What was your reason for going into the grocery store?

A. To get the money, of course.

Q. You went in there to rob the grocery store?

A. Yes.

Q. Did you have any weapons with you?

A. Yes, I did.

Q. What type of weapon did you have?

A. A 22 pistol.

\* \* \* \* \* \*

Q. Did you have the gun out of your pocket during this time when you were in the back of the store?

A. Yes, I did. I had it on the manager [Jenness].

\* \* \* \* \* \*

Q. You heard [the sniper's] shot and you shot, is that correct?

A. I heard a loud bang, it could have been someone closing a window or someone driving a car, but I heard a loud bang, I felt something shattering on my face and my back. It all happened at the same time, and at the same time my finger wouldn't go on it. I heard bang, that's all. I heard a bang. I know I fired the weapon and I know I shot her in the head, I guess I shot her in the head.

\* \* \* \* \* \*

Q. How many times did you shoot your gun?

A. Once that I know of. That's all I had time for. Like I said, it was a chain reaction thing as far as I'm concerned.

\* \* \* \* \* \*

3. Both of which, in substance, require the trial court, whether requested or not, to instruct the jury upon all questions of law arising in the case which are necessary for their information in arriving at a verdict. These propositions of law are collectively referred to as "the law of the case".

Q. I haven't made any promises to you, have I?

A. I knew I couldn't get away with it. There's no way of getting away with something like that. I wish the gun hadn't of gone off, whether I shot it or whether it was a chain reaction or whether it was reflex or whatever it was, I wish it wouldn't have gone off, at least not in her head, that I'd just got her in the shoulder or a flesh wound or something. Even accidental, purposely I don't think I could have shot her.

Defendant emphasizes some of these self-contradictory answers and cites us to *State v. Mills*, supra, 352 Mo. 774, 179 S.W.2d 95, wherein it was held that the defendant's own testimony that he did not intend to fire into a dwelling, but shot at a fleeing burglar or prowler was sufficient to entitle him to an instruction on manslaughter. *State v. Mills*, supra, 352 Mo. at 778–779, 179 S.W.2d at 97–98[3][4–6]. There are points of difference between the *Mills* case and this case which make the *Mills* case inapplicable here. Even if defendant's subjective intent were material here, we should be inclined to hold his denial of an intent to kill, encumbered as it is with the physical facts and his own conduct, and unreasonable and contrary to common experience, as it is, did not constitute evidence requiring instruction on lesser graded offenses. *State v. Bevineau*, 460 S.W.2d 683, 688[9, 10][11] (Mo.1970); *State v. Johnson*, 326 Mo. 1030, 1033, 33 S.W.2d 912, 913[2] (1930).

■ The insuperable difficulty with defendant's argument, however, is that the evidence shows the killing was committed during the perpetration of one of the felonies enumerated in § 559.010, and therefore defendant's intent is wholly immaterial. *State v. Sykes*, supra, 436 S.W.2d at 36[10]; *State v. Cole*, 354 Mo. 181, 195, 189 S.W.2d 541, 542[2] (1945); *State v. Meadows*, 330 Mo. 1020, 1028, 51 S.W.2d 1033, 1037–1038[14, 15] (1932); *State v. Glover*, 330 Mo. 709, 718, 50 S.W.2d 1049, 1052, 87 A.L.R. 400, 406 (1932). In such cases, the intent to commit the underlying felony attaches to the homicide, and the law conclusively presumes the intent to kill. *State v. Glover*, supra, 330 Mo. at 718, 50 S.W.2d at 1052; *State v. Wieners*, 66 Mo. 13, 22 (1877). Nor was the defendant here entitled to an instruction upon accidental homicide, which we think was the real tenor and effect of his protestation that he fired reflexively or as part of "a chain reaction". This case is in no wise factually comparable to *State v. Randolph*, supra, 496 S.W.2d 257. The defendant denied an intention to kill; he did not deny the robbery, nor was there any fact or circumstance adduced by the State from which a jury could have reasonably inferred that the homicide was accidental. Under the common law and under the statutes, the perpetrator of a crime must have acted without wrongful purpose while engaged in a lawful enterprise and without negligence on his part to be entitled to the defense of excusable homicide, *State v. Browning*, 442 S.W.2d 55, 57[4] (Mo. banc 1969); *State v. Cook*, 512 S.W.2d 907, 910[4] (Mo.App.1974), and in this first-degree felony murder case, there was no such fortuity in the killing as to require an accidental homicide instruction. *State v. Burnett*, supra, 365 Mo. at 1074, 293 S.W.2d at 343[17]; *State v. Meadows*, supra, 330 Mo. at 1028, 51 S.W.2d at 1037–1038[14, 15].

Further, extended discussion of the points raised or suggested seems unnecessary. There is simply no species of proof in this appalling record which would support the conclusion that this killing was committed otherwise than in the commission of a robbery in the first degree. In our opinion, *State v. Ford*, 495 S.W.2d 408, 417[12] (Mo. banc 1973), controls, and is authority for our holding that no error of the order contemplated by Rule 27.20(c) was committed in refusing instructions upon second-degree murder and manslaughter. Accordingly, the judgment is affirmed.

All concur.